IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Response Genetics, Inc.,[1] | ) | Case No.: 15-11663 (___) |
| | ) | |
| Debtor. | ) | |

## DECLARATION OF THOMAS A. BOLOGNA, IN SUPPORT OF FIRST DAY MOTIONS

I, Thomas A. Bologna, hereby declare that the following is true to the best of my knowledge, information and belief:

1.      I am the Chairman of the Board of Directors and Chief Executive Officer of Response Genetics, Inc., (the "Debtor" or the "Company"). I submit this declaration (the "Declaration") in support of the Debtor's voluntary petition and "first day" motions and applications described in Part II below (collectively, the "First Day Motions"). Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's employees at my direction, or my opinion based on my experience with the Debtor's operations and financial condition.  In making my statements based on my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's employees, I have relied upon these employees to

---

[1] The last four digits of the Debtor's federal tax identification number are (5548).  The Debtor's address is:  1640 Marengo Street, 7th Floor, Los Angeles, CA 90033.

accurately record, prepare or collect any such documentation and other information. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or opinion.  I am authorized to submit this Declaration on behalf of the Debtor.

2.      I was appointed Chairman of the Board of Directors and Chief Executive Officer of the Company on December 21, 2011. From April 2006 until my appointment as the Debtor's Chief Executive Officer, I served as President and Chief Executive Officer of Orchid Cellmark, Inc., a then public corporation that provides DNA identity testing services. From 2004 to 2005, I was Chief Executive Officer, President, and a director of Quorex Pharmaceuticals, Inc., a pre-clinical stage anti-infective company. From 1997 to 2003, I was Chief Executive Officer, President, and a director of Ostex International, Inc., a then public corporation which developed, manufactured, and marketed products for the management of osteoporosis, and from 1999 to 2003 I was also chairman of the board of Ostex. From 1996 to 1997, I was a principal at Healthcare Venture Associates, a consulting firm. From 1994 to 1996, I was Chief Executive Officer, President, and a director of Scriptgen Pharmaceuticals, Inc., a biotechnology company with proprietary drug-screening technology that developed orally active drugs to regulate gene expression. From 1987 to 1994, I was Chief Executive Officer, President, and a director of Gen-Probe Incorporated, a biotechnology company, which I took public, that commercializes molecular diagnostics products and services, and from 1992 to 1994 I was also chairman of the board of Gen-Probe. My prior experience also includes senior-level positions with Becton Dickinson & Company and Warner-Lambert Company which was later acquired by Pfizer, Inc. I

currently serve as a director of Special Diversified Opportunities Inc. (formerly known as Strategic Diagnostics Inc.) and Quotient Biodiagnostics. I previously served on the Aperio Technologies board of directors until its sale in the fourth quarter of 2012 to Danaher Corporation. I received an M.B.A. and a B.S. from New York University.

3.      Part I of this Declaration describes the business of the Debtor and the developments that led to the filing for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Part II of this Declaration sets forth the relevant facts in support of the First Day Motions filed concurrently herewith in support of the Debtor's chapter 11 case (the "Case").

## PART I

### A.      Overview of the Debtor and Its Operations

### Introduction

4.      The Debtor was incorporated in Delaware in September 2009 as Bio Type, Inc. for the purpose of providing unique molecular profiling services of tumor tissue. In August 2000, the Debtor changed its name to "Response Genetics, Inc.

5.      The Debtor is life science company engaged in the research and development of clinical diagnostic cancer testing. Clinical studies have shown that not all cancer therapy works effectively in every patient, and that a number of patients receive therapy that has no benefit to them and may potentially even be harmful. The outcome of cancer therapy is highly variable due to genetic differences among the tumors in cancer patients. For example, some patients respond well with tumor shrinkage and increase in life span, while other patients do not

obtain benefit from the same therapy and may actually experience toxic side effects, psychological trauma, and delay in effective treatment.

6.      Prior to 1999, most cancer treatment regimens were administered without any pre-selection of patients on the basis of the particular genetics of their tumor. However, advances in molecular technologies have enabled researchers to identify and measure genetic factors in patients' tumors that may predict the probability of success or failure of many anti-cancer agents. The Debtor's goal is to provide cancer patients and their physicians with a means to make informed, individualized treatment decisions based on genetic analysis of tumor tissues. The Debtor's goal is to provide personalized genetic information that helps guide physicians and patients in choosing the treatment based on the genetics of the tumor that will most likely benefit the patient.

7.      To achieve these goals, the Debtor's pathologists use tools and methods to extract the relevant data from patients that provide their physician with better information to arrive at the best treatment. These tools and methods include Microdissection, RNA Extraction, Quantitative Real-Time Polymerase Chain Reaction, Fluorescence *in situ* Hybridization, Sequencing, next generation sequencing, and Microarray. The Debtor markets ResponseDX, predictive test for lung, colon, gastric and melanoma cancer testing and in 2013 added testing for thyroid cancer and in 2014 testing for brain cancer. The Debtor also markets testing for breast cancer. In February of 2014, the Debtor commercially launched its cancer "ResponseDX: Tissue of Origin®" test to compare the expression of 2,000 genes in a patient's tumor with a panel of fifteen known tumor types that represent 90% of all cancers to help diagnosis difficult cancers to

identify. ResponseDX: Tissue of Origin received clearance from the Food and Drug

Administration in June 2010. The Debtor is fully licensed and accredited by the Clinical

Laboratory Improvement Amendments and College of American Pathologists.

## Business Operations

8.     The Debtor currently employs approximately ninety-two full-time

employees in hourly, salaried, supervisory, management, sales, and administrative positions to

perform the functions necessary to effectively and efficiently operate the Debtor's business. The

Debtor's employees are not represented by any collective bargaining organizations. The Debtor

believes that its relations with employees to be good. The Debtor is incorporated in Delaware

and its principal executive offices located in Los Angeles, California. The Debtor has one wholly

owned affiliate, Response Genetics, Ltd., a Scottish Corporation, which currently has no

employees or active operations. All significant intercompany transactions have been eliminated

in consolidation.

9.     **Sales, Marketing, and Client Services.** The Debtor's ResponseDX

services are offered nationwide and in some instances, internationally. The primary sales market

includes community based oncologists, pathologists and hospitals. The Debtor believes that

selling diagnostic testing services of cancer requires a knowledgeable and skilled sales force that

can help oncologists and pathologists understand the value of the Debtor's testing services. As a

result, the Debtor's account executives generally have previous sales experience in the oncology

and the pathology field, including diagnostic equipment sales market, medical diagnostic

services market, and/or laboratory services market and have knowledge of community-based hospitals and oncology practices.

10.     The sales force is compensated through a combination of salary and commissions based upon actual sales performance and incentives from time to time, all at levels commensurate with each individual's qualifications, performance and responsibilities. As of July 31, 2015, our sales team was comprised of fifteen members. The sales force is organized into three regions, Northeast, Southeast and West. The Regional Sales Director in each region trains account executives and develops sales territories while supporting the account executives in his or her region.

11.     **Inbound and Outbound Intellectual Property and License Agreements.** The Debtor relies on a combination of patents, trade secret, copyright and trademark laws, license agreements, nondisclosure and other contractual provisions and technical measures to protect our intellectual property rights in our products, technology and processes. The Debtor has proprietary rights in several areas as further described below.

a.     **USC.** In April 2000, as amended in June 2002 and April 2005, the Debtor entered into a license agreement with the University of Southern California ("USC"), pursuant to which USC granted the Debtor a worldwide, exclusive license with the right to sublicense, the patents for nucleic acid extraction methodologies ("RGI-1") and related technology, for use in human and veterinary diagnostic laboratory services, the sale of clinical diagnostic products, and the sale of research products to the research community. USC retains the right under the agreement to use the technology for research and educational purposes. In

consideration for this license, the Debtor agreed to pay USC royalties based on a percentage of

net sales of products or services that make use of RGI-1 and related technology, and to meet a

certain minimum in royalty payments, if any. Royalty expense, included in the cost of revenue

section of the accompanying consolidated statement of operations, for the years ended December

31, 2013 and 2014 was $305,616 and $42,289, respectively. In addition, in the year ended

December 31, 2014, the Company recorded credits to the royalty expense of $240,077 in each of

the third and fourth quarters, representing, in the aggregate, a one-time $480,154 adjustment for

prior period over-accruals resulting from a change in the estimate of the royalty expense. The net

credit of $437,865 is included in our cost of revenue.

        b.    **Roche**. In November 2004, the Debtor entered into an agreement

with Roche Molecular Systems, Inc. ("Roche") pursuant to which the Debtor obtained a royalty-

bearing, non-exclusive, personal, non-transferable license to use certain technology, including

specified nucleic acid amplification processes, to perform certain human invitro clinical

laboratory services. In consideration for this license, the Debtor pays royalties to Roche based on

a percentage of net sales of products or services that make use of this process. Royalty expense

relating to this agreement, included in the cost in revenue section of the accompanying

consolidated statement of operations, amounted to $280,325 and $211,932 for the years ended

December 31, 2013 and 2014, respectively.

        c.    **GSK**. In January 2006, the Debtor entered into a master services

agreement with GlaxoSmithKine, LLC ("GSK"), a leading pharmaceutical manufacturer,

pursuant to which the Debtor provides services in connection with profiling the expression of

various genes from a range of human cancers. Under the agreement, the Debtor provides GSK

with testing services as described in individual protocols and GSK pays for such services based

on the pricing schedule established for each particular protocol. GSK is obligated to make

minimum annual payments to the Debtor under the agreement and also was obligated to make a

non-refundable upfront payment to the Debtor, to be credited against work undertaken pursuant

to the agreement. The Debtor recognized revenue of $1,134,366 and $174,597 relating to the

GSK agreement for the years ended December 30, 2013 and 2014, respectively.

        d.      In March 2010, the Debtor entered into a non-exclusive license

agreement with GSK. Under the agreement, the Debtor granted GSK a nonexclusive,

sublicenseable license to its proprietary PCR analysis technology and diagnostic expertise to

assess BRAF gene mutations in human tumor samples. As part of the agreement, the Debtor

received a non-refundable technology access fee in consideration for the transfer of the Debtor's

technology to GSK. The agreement also contains milestone provisions which allowed the

Company to earn further payments from GSK. The Debtor has met all the milestones in the

agreement and earned the three milestone payments of $500,000 each in July 2012, May 2013

and December 2013.

        e.      **GSK Bio**. On July 26, 2012, the Debtor entered into a second

amended and restated master services agreement with GlaxoSmithKline Biologicals S.A. ("GSK

Bio"), the vaccine division of GSK. Pursuant to this agreement, as amended, the Debtor provides

testing services for clinical trials and epidemiology studies relating to GSK Bio's cancer

immunotherapies. The Debtor performs these testing services on a fee-for-service basis as

embodied in written task orders. GSK Bio retains the intellectual property rights to inventions, improvements and data resulting from the services performed under the agreement. The Debtor retains all intellectual property rights to its testing services, proprietary processes. All intellectual property owned by either party on the date of the agreement remains the exclusive property of the owning party. The Debtor recognized revenue of $3,534,619 and $1,287,184 relating to the services performed for GSK Bio for the years ended December 31, 2013 and 2014, respectively.

      f.     **SBC**. In March 2007, the Debtor entered into a collaboration agreement with Shanghai BioChip Company, Ltd. ("SBC") pursuant to which SBC provides exclusive pharmacogenomic testing services to the Debtor's clients in China. Pursuant to the agreement, the Debtor granted SBC an exclusive license in China to provide services in China using the Debtor's proprietary RNA extraction technologies. Subject to consent from USC, the Debtor granted SBC an exclusive sublicense to patents licensed from USC for distribution of testing services in China. In turn, SBC performs RNA extraction from formalin-fixed paraffin-embedded tissue specimens exclusively for the Company during the term of the agreement. This agreement had an initial term of five years, with an automatic renewal for an additional three-year term unless either party gives 90 days' notice in advance of the renewal date of its intent not to renew. As neither party gave notice of intent not to renew, the agreement has automatically renewed for a successive three year period. Pursuant to the agreement, SBC receives a percentage of the gross margin, as defined in the agreement, collected from the Company's clients in China as compensation for its testing services performed. For the years ended December 31, 2013 and 2014, testing services totaled $35,027 and $48,948, respectively.

**B.**     **Equity, Board of Directors, Revenues and Significant Indebtedness**

12.     The Debtor is a publicly traded company on the OTCQB exchange under the symbol "RGDX" and has been trading on the OTCQB exchange since June 2015. Prior to June 2015, the Debtor was publicly trading on the NASDAQ Stock exchange under the symbol "RGDX" since its initial public offering in June 2007. As of August 4, 2015, there were approximately twenty-five stockholders of record of the 38,795,396 shares of common stock. On the date hereof, the largest holders of the Debtor's common stock are Bridger Management, LLC (15.59%), GlaxoSmithKline plc ((12.9%), Lansdowne Partners Limited Partnership (9.8%), and 12 West Capital Management LP (6.3%).

13.     As of July 2014, the Debtor's board of directors consists of Thomas A. Bologna (Chairman) and also the CEO of the Debtor, Kirk K Calhoun, Sam Chawla, David R. Schreiber, Michael Serruya, Richard van den Broek, and David M. Wurzer. The background of each of the Debtor's directors may be found in its latest Form 10-k filed with the SEC.

14.     The Debtor currently generates revenues primarily from sales of its ResponseDX diagnostic tests and by providing clinical trial testing services to pharmaceutical companies. Revenue was $16,720,327 for the year ended December 31, 2014, as compared to $19,801,359 for the year ended December 31, 2013, a decrease of $3,081,032 or 15.6%. The decrease was primarily due to a decrease in contracted pharmaceutical revenue of $5,665,855. ResponseDX revenue increased $2,584,823, an increase of 21.5%. ResponseDX revenue accounted for 87.3% of total revenue in the year ended December 31, 2014 compared to 60.7% for the year ended December 31, 2013. ResponseDX revenue increased over the prior year

primarily as a result of the introduction of our ResponseDX: Tissue of Origin ® testing

protocols, targeted marketing programs and enhanced sales and marketing efforts. For the year

ended December 31, 2014, our two most significant pharmaceutical clients accounted for

approximately 8.7% of our revenue, as compared to approximately 23.8% of our revenue for the

year ended December 31, 2013. This decline is the direct result of the conclusion of a large

testing contract in 2014, offset by new, smaller contracts.

15.    **Prepetition Debt.**  As described in greater detail below, the Debtor has a

secured revolving line of credit and term loan. In addition, the Debtor has various trade debts that

it has incurred in the ordinary course of its business.

a.    **Silicon Valley Bank**. On July 14, 2011, the Debtor entered into a

line of credit agreement (the "Revolving Credit Facility") with Silicon Valley Bank (the "SVB").

The line of credit is collateralized by all of the Debtor's assets, including the pharmaceutical

Private Payor and Medicare receivables. The amended maximum amount that can be borrowed

from the credit line is $2,000,000. The line of credit is subject to various financial covenants. In

2013, the Debtor was not in compliance with certain covenants and, pursuant to an amendment

on March 7, 2013, SVB waived the Debtor's existing breach of financial covenants under the

credit agreement and the parties restructured the line of credit to provide that, among other

things, the maturity date was extended to March 7, 2015 in addition to other borrowing

covenants. On July 30, 2014, SVB waived several additional covenant violations and amended

the credit agreement to provide, among other things, increased interest rate, revised borrowing

covenants, and a maturity date of July 25, 2016. On the date hereof, the Debtor estimates that

approximately $1,465,662, plus accrued fees, interest, and other charges, is outstanding under the Revolving Credit Facility.

       b.    **SWK Funding LLC**. On July 30, 2014, the Debtor entered into a credit agreement (the "SWK Credit Agreement") with SWK Funding LLC, as the administrative agent ("SWK") and the lenders (including SWK). On September 9, 2014, SWK, in its capacity as the initial lender, assigned part of its interests under the SWK Credit Agreement to SGFinancial, LLC ("SG"). On January 30, 2015, SG assigned all of its interests under the SWK Credit Agreement to SWK. As such, as of January 30, 2015, SWK is the sole Lender under the SWK Credit Agreement. The SWK Credit Agreement provides for a multi-draw term loan up to a maximum principal amount of $12,000,000. Initially, the lenders advanced $8,500,000 to the Debtor, which is due and payable on July 30, 2020. On February 3, 2015, the Debtor and SWK entered into a first amendment to the SWK Credit Agreement by which the Debtor drew an additional $1,500,000 of the commitment increasing the total amount advanced to $10,000,000.

       On April 3, 2015, the Debtor and SWK entered into a second amendment to the SWK Credit Agreement by which the Debtor drew an additional $2,000,000 of the commitment increasing the total amount advanced to $12,000,000. On June 25, 2015, the Debtor and SWK entered into a third amendment to the SWK Credit Agreement by which SWK expanded the maximum principal amount of the loan to $12,750,000 and the Debtor drew the additional $750,000 of the commitment increasing the total amount advanced to $12,750,000. On August 4, 2015, the Debtor and SWK entered into a fourth amendment to the SWK Credit Agreement by which SWK expanded the maximum principal amount of the loan to $13,250,000

and the Debtor drew the additional $500,000 of the commitment increasing the total amount advanced to $13,250,000. On the date hereof, the amount outstanding under the SWK Credit Agreement is approximately $13,250,000 plus accrued and unpaid interest.

**C.    Circumstances Leading to the Commencement
of the Chapter 11 Case and Goals of Chapter 11 Case**

16.    At the conclusion of the fourth quarter of 2011, the Debtor estimates that it lost approximately $4 million that quarter. Mr. Thomas A. Bologna was hired as the Debtor's Chief Executive Officer around this time to lead an effort that addressed the Debtor's strategic, operational and financial struggles.

17.    To address these operational and financial struggles, the Debtor initially focused on strengthening the Debtor's balance sheet, recruiting and strengthening the Debtor's management team and focusing on enhancing the Debtor's service offerings and as well as the service levels to the Debtor's Response DX customers and it pharmaceutical partners including GlaxoSmithKine, LLC ("GSK"), a leading pharmaceutical manufacturer.

18.    Beginning in 2012, the Debtor also upgraded its testing facility including the initiation of a state of the art Laboratory Information Management System.  While these infrastructure changes were necessary and beneficial to the operations of the Debtor, they were costly and added to financial difficulties of the Debtor as the clinical laboratory testing services was about to undergo rapid change in reimbursement levels as well as testing capabilities.

19.    The Debtor addressed its over leveraged balance sheet, which the Debtor was able to reduce through equity infusions that totaled approximately $7.8 million. Later in

September 2012, the Debtor was able to raise additional equity infusions in the aggregate amount of $8.8 million.

20.    The Debtor also revamped its Response DX salesforce to be better suited to the rapidly changing clinical laboratory market place and the headwinds the market was facing.  Additionally, infrastructure was added to better direct the Debtor's sales people.

21.    The Debtor also enhanced its infrastructure to better service the needs of its pharmaceutical customers including its existing relationship with GSK.

22.    As a result of these efforts, the Debtor was able to reduce is quarterly losses to approximately $500,000 (down from $4 million) by the fourth quarter of 2012. However, in January 2013, the industry reimbursement structure for the Debtor's services was materially changed and the industry was entering what could be described as an uncertain transition period.  Reimbursement rates were declining, reimbursement for tests were becoming more uncertain and collections were becoming increasingly challenging.

23.    Until approximately the Fall of 2012, the Debtor was able to conduct business in the state of New York under a provisional license. However, around this time, the Debtor was no longer able to conduct business within the state of New York because the provisional license was rescinded.

24.    In response to the weakening condition of the Debtor's finances and sales, and the Debtor's belief that the industry would consolidate as a result of the rapidly changing marketplace in the Summer of 2014, the Debtor began interviewing investment bankers for the purpose of exploring strategic alternatives including a merger of the Debtor with one of a group

of specified targets. In August 2014, the Debtor hired a banker that marketed the Debtor's assets for approximately six months. The Debtor's former banker was able to locate and secure interested parties willing to purchase some or substantially all of the Debtor's assets and effectuate a merger with the Debtor, but the process was lengthy and for a host of reasons did not materialize in a timely manner.

25.    As a result, the Debtor has been engaged with its term loan lender, SWK, during the past several months about the additional loans for the purpose of funding operations and a potential bridge to a sale. On July 10, 2015, the Debtor engaged Canaccord Genuity, Inc. ("Canaccord") for the purpose of marketing the Debtor's assets and/or a capital raise.

26.    The Debtor will use the protections provided by the chapter 11 process to effect a sale of all or substantially all of its assets.  The Debtor believes that the chapter 11 filing provides it with the best chance of preserving the value of its business assets and maximizing the return to all of the stakeholders of the Company.

27.    To this end, on August 9, 2015, the Debtor executed an agreement (the "Agreement") under which it has agreed in principle to sell substantially all of its business assets in a sale conducted under supervision by the United States Bankruptcy Court for the District of Delaware.  The initial "stalking-horse" purchaser under the agreement is Cancer Genetics, Inc. ("CGI").  As required by the Bankruptcy Code, the sale to CGI will be subject to overbidding by other prospective purchasers.

28.     CGI is a company focused on the development and sale of molecular diagnostic tests that help to determinate a patient's response to cancer therapy.  Its stock is traded on the Nasdaq (CGIX).

29.     Under the Agreement, the Debtor has proposed to sell substantially all of its assets, including its corporate office in Los Angeles, California and certain leasehold improvements, tangible personal property, intangible property, leases and contracts, accounts receivable, inventory and business records.  The purchase price for the assets, subject to certain adjustments, is proposed to consist of $14,000,000, comprised of a 50/50 split in value of cash and the common stock of CGI.  The number of shares of CGI stock to be delivered to the Debtor at the closing of the sale will be based on the value per share of the CGI stock, determined as the average of the closing prices per share on each of the three trading days immediately preceding announcement of the proposed sale.  All shares of CGI's stock included in the purchase price will be issued directly to the Debtor's secured lenders.  As additional consideration, CGI has agreed in principle to assume certain liabilities of the Debtor, including liabilities related to existing agreements with employees, customers, vendors, suppliers and trade creditors.

30.     The agreement in principle remains subject to finalization of all schedules and exhibits to the agreement within seven days of the Debtor's commencement of its chapter 11 case.  In addition, the agreement is proposed to be subject to the satisfaction of a number of closing conditions, including Bankruptcy Court approval and the absence of certain material adverse events.  No assurance can be given that the sale will be consummated on the anticipated terms, or at all.  Upon the occurrence of certain events or defaults by the Debtor, the purchaser is

entitled to terminate the Asset Purchase Agreement and to receive a break-up fee in an amount equal to 4% of the aggregate purchase price and reimbursement of up to $125,000 of its expenses in connection with the transaction.

## PART II

### First Day Motions and Applications

31.    To enable the Debtor to minimize the adverse effects of the commencement of the Case, the Debtor has requested various types of relief in the First Day Motions filed concurrently with this Declaration. A summary of the relief sought in each First Day Motion is set forth below.

32.    I have reviewed each of these First Day Motions (including the exhibits and schedules thereto). The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the type of relief sought in each of the First Day Motions: (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption to its current business operations; and (b) is essential to maximizing the value of the Debtor's assets for the benefit of its estate and creditors.

### A.    Cash Management Motion

33.    By the Cash Management Motion, the Debtor seeks an order (i) authorizing the continued use of existing (a) bank accounts, (b) cash management system, and (c) business forms and checks; and (ii) waiving the investment and deposit requirements of 11 U.S.C. § 345(b) on the terms set forth in the order.

34.    The Debtor maintains a carefully constructed cash management system (the "Cash Management System") that ensures the Debtor's ability to efficiently monitor and control all of its cash receipts and disbursements. The Debtor maintains four (4) bank accounts (the "Bank Accounts") to facilitate the Debtor's Cash Management System. The Bank Accounts are located at Silicon Valley Bank, which I am informed is an approved depository.

35.    It is my belief that closing the existing Bank Accounts and opening new accounts would disrupt the Debtor's business and result in delays impeding the Debtor's ability to transition smoothly into chapter 11, and would likewise jeopardize the Debtor's efforts to successfully reorganize in a timely and efficient manner. Moreover, closing the Bank Accounts and opening new ones will increase the work required of the Debtor's accounting personnel who are already dealing with the many and varied issues related to this case. Moreover, such efforts would needlessly cost the Debtor time and money with no discernable benefit to its estate at a time when it is trying to conserve both.

36.    I am informed that, upon the filing of a petition for relief under chapter 11 of the Bankruptcy Code, debtors in possession are normally required by the U.S. Trustee Operating Guidelines (the "UST Guidelines") to (i) close all of their existing bank accounts, (ii) open new "debtors in possession" bank accounts, and (iii) ensure that all checks and forms bear the designation "debtors in possession." If strictly enforced in this case, the United States Trustee's requirements would cause a severe disruption in the Debtor's activities and would impair the Debtor's ability to operate under chapter 11. Accordingly, the Debtor seeks a waiver of these requirements to the extent set forth in the motion.

37.    The Cash Management System constitutes the Debtor's ordinary, usual and essential business practices, and is similar to those used by other corporate enterprises. The Cash Management System provides significant benefits to the Debtor, including the ability to control corporate funds centrally, segregate cash flows, and ensure availability of funds when necessary. The Cash Management System reduces administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information.

38.    Continued use of the Cash Management System is essential to the Debtor's restructuring efforts during the pendency of this chapter 11 case. Requiring the Debtor to adopt new cash management systems at this critical stage of this case would be expensive, create unnecessary administrative burdens and problems and likely disrupt and adversely impact the Debtor's ability to reorganize successfully. Indeed, requiring changes to the Cash Management System could irreparably harm the Debtor, its estate and its creditors by creating cash flow interruptions while systems are changed. Maintenance of the existing Cash Management System is therefore in the best interests of all creditors and other interested parties.

39.    Because the Debtor tracks the movement of cash in its Cash Management System and has worked with its financial advisors to ensure proper controls are in place, there will be no confusion of postpetition transactions with prepetition transactions. Requiring the Debtor to close the Bank Accounts would serve no purpose but would, as stated, put further burdens on accounting personnel dealing with the Debtor's many financial issues and cost the Debtor time and money better used in its efforts to maximize value of the estate for the creditors.

Further, requiring the Debtor to open additional accounts would only complicate the Debtor's

cash management system with no real benefit coming for that added complication.

**B.**    **Wage and Benefits Wage Motion**

   40. As of the Petition Date, the Debtor employs approximately ninety-one

individuals (the "Employees"). Approximately eighty-two of the Employees are located at the

Debtor's offices in Los Angeles. The others are primarily Sales Account Executives and

Management.

   41. The Employees are paid via automatic deposit or check every other week,

one week in arrears. The Employees will be paid on August 14, 2015 for the two week period on

August 7, 2015. The Employees will be paid again on August 28, 2015 for the two week period

ending August 21, 2015, which only includes two prepetition dates, August 8 and 9, 2015.

   42. As of the Petition Date, there will be due and owing approximately

$331,500 in earned and unpaid salary and commissions (the "Unpaid Wages"). By the Wage

and Benefit Motion, the Debtor requests authority to pay up to $331,500 of Unpaid Wages that

may have accrued before the Petition Date. No single employee will receive greater than

$12,475.

   43. The Debtor also seeks authority to pay, in its sole discretion, prepetition

employee-related obligations in the ordinary course.  In particular, the Debtor seeks authority to

pay and/or honor, as the case may be, in its sole discretion, certain prepetition claims of

Employees, for, among other things, (a) wages, salaries, commissions, and other accrued

compensation, (b) reimburse all prepetition Employee business expenses and maintain corporate

credit cards, (c) make prepetition contributions and pay benefits under certain Employee benefit plans, including without limitation, certain medical, dental, vision, 401(k), flexible spending, and (d) honor disability, life insurance, and other workers' compensation obligations (the foregoing and other similar obligations collectively referred to herein as the "Employee Obligations").

44.     Many Employees live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in order to continue to pay their daily living expenses. These Employees may be exposed to significant financial and healthcare related problems if the Debtor is not permitted to pay and/or honor the Employee Obligations, and the expenses associated therewith, in the ordinary course of the Debtor's business.  Moreover, the Debtor believes that if it is unable to honor accrued Employee Obligations, employee morale and loyalty will be jeopardized at a time when employee support is critical.

45.     The Employees have an intimate knowledge of the operation of the Debtor's business and are critical components to the success of this Case.  Deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtor and its ability to maximize the value of its assets. Satisfaction of the Employee Obligations, as described in the Wage and Benefit Motion, is necessary to maintain the Employees' morale during this case and to insure continued, efficient operation in order to maximize value for all creditors.

C.    **DIP Financing Motion**

46.    Pursuant to the DIP Financing Motion, the Debtor seek the entry of an interim and final order, authorizing its entry into a senior debtor-in-possession term loan facility extended by SWK in the principal amount of up to $16,250,000, inclusive of any and all amounts outstanding under SWK's prepetition credit agreement.  Of this amount, up to $3,000,000 constitutes new money advances to the Debtor.

47.    During the course of the review of strategic alternatives, it became apparent that a significant new capital investment would be required for the Debtor to satisfy its working capital and liquidity requirements, whether in the context of an out-of-court or in-court restructuring.

48.    As a result, the Debtor and its advisors engaged in negotiations with SWK for debtor in possession financing. After negotiating terms with SWK, which were improved from its initial proposal, the Debtor, together with its advisors, determined that the SWK proposal is within competitive market terms and provided the most advantageous terms to the Debtor under the circumstances. And by accepting the SWK's proposal, the Debtor eliminated an unnecessary priming fight.

49.    The Debtor has an urgent and immediate need to obtain postpetition financing.  The Debtor does not have sufficient funds on hand or generated from its business to fund its operations.  Without the proposed postpetition financing and the use of cash collateral as set forth in the proposed interim order, the Debtor would not be able to maintain its going

concern value or to effectuate an orderly sale process that would maximize value for all constituents.

50.    Specifically, without the proposed credit facility and access to cash collateral, the Debtor will not have the liquidity to operate its business, fund its ordinary course expenditures, including paying its approximately 92 employees, or pay the expenses necessary to administer the chapter 11 case, pending the contemplated sale of the Debtor's assets.  Absent adequate funding, the Debtor would be required to cease operations and liquidate on a piecemeal basis (resulting in proceeds likely to be substantially less than those that can realized in an orderly section 363 sale), causing irreparable harm to the Debtor and its estate.  Accordingly, the Debtor has an urgent and immediate need for the postpetition financing facility.

51.    The Debtor sought and was unable to obtain financing from other sources on terms preferable to the proposed postpetition financing facility.  I do not believe that the Debtor is able to obtain postpetition financing or other financing accommodations from any prospective lender or group of lenders on more favorable terms and conditions than those described herein.  The postpetition financing facility was negotiated in good faith and at arm's length, and extensively and diligently considered by the Debtor.  I believe that the proposed terms of the postpetition financing facility are fair and reasonable in light of current market conditions and is in the best interests of the Debtor's estate.  Moreover, by entering into a postpetition financing facility arrangement with its prepetition secured lender SWK, and having been able to negotiate successful adequate protection arrangements with the SWK and SVB, the

Debtor has eliminated any unnecessary priming fight with the Debtor's prepetition secured lenders.

**D.    Utility Motion**

52.    In the normal course of business, the Debtor has relationships with various utility companies and other providers (each a "Utility Provider" and, collectively, the "Utility Providers") for the provision of telephone, cell phone, internet connectivity, and related services (the "Utility Services"). The Debtor relies upon approximately four different Utility Services to operate its business. The Debtor's estimated average monthly postpetition payments to the Utility Providers will aggregate approximately $11,000.

53.    The Debtor cannot continue to operate without continued Utility Services. If any of the Utility Providers alter, refuse or discontinue service, even for a brief period, the Debtor's business operations would be severely disrupted. In contrast, the Utility Providers will not be prejudiced by the continuation of their services and will be paid all postpetition utility charges. It is therefore critical that Utility Services continue uninterrupted. Thus, I believe the relief requested in the Utilities Motion is essential to this estate and its reorganization efforts.

**E.    Essential Vendors Motion**

54.    The Debtor undertook a process to identify key vendors and providers of goods and services and similar counterparties that the Debtors deem essential to maintaining their ongoing business operations (the "Essential Vendors") using the following criteria: (a) whether a vendor is a sole-source provider; (b) whether certain customizations, specifications, or volume requirements prevent the Debtors from obtaining a vendor's goods or services from

alternative sources within a reasonable timeframe; (c) whether a vendor is likely to refuse to continue providing goods or services to the Debtor postpetition if its prepetition outstanding balances are unpaid; and (d) if a vendor is not a sole-source provider, whether the Debtor can continue to operate in the ordinary course while a replacement vendor is secured.

55.     The Debtor cannot provide, through their own resources, all of the essential goods and services necessary to operate the mine.  Rather, the Debtor purchases goods and services in the ordinary course of business from the third party Essential Vendors to provide them with essential goods and services, including:  (i) carriers that transfer tissue specimens from hospitals and other customers to the Debtor, (ii) essential services such as information technology and other corporate support services for the Debtor's customers and to collect accounts receivable, (iii) services that maintain the Debtor's intellectual property, and (iv) entities that store tissue samples of the Debtor and its customers. The stoppage of any of these services or receipt of goods would cause material impairment to the Debtor's ability to conduct its business.  The Debtor is dependent upon these Essential Vendors to ensure the successful delivery of goods to the Debtor's business so that it can continue to provide its services to customers.  Any interruption in the supply of goods or services that the Essential Vendors provide would be catastrophic to the Debtor's business.

56.     The Essential Vendors rely on quick and full payment from the Debtor. Absent such assurance of immediate payment either in part or in whole, the Essential Vendors could refuse to deliver goods and services to the Debtor.  This would disrupt and harm the Debtor's businesses and hinder the Debtor's ability to replace any departing Essential Vendors

with alternative providers in a timely manner.  It may also force the Debtor to obtain services

elsewhere at a higher price or in a quality insufficient to satisfy the Debtor's needs.  Without the

Essential Vendors standing at the ready to provide goods and services to the Debtors, the

Debtor's business would suffer.  The Debtor believes that it would be extremely difficult, if not

impossible, to replace the Essential Vendors within a reasonable time without severe disruption

to the Debtor's business.  Given the importance of the services provided by the Essential

Vendors, it is imperative that the Debtor be granted, on an emergency basis, the flexibility and

authority to satisfy the prepetition claims of the Essential Vendors, as any disruption in the

Debtor's ability to provide services to their customers would cause immediate and irreparable

damage to the Debtor's business.

**F.**     **Debtor's Application for Order Appointing Rust Omni as Claims and Noticing Agent**

57.     The Debtor seeks to retain Rust Consulting Omni Bankruptcy ("Rust

Omni") as its notice and claims agent ("Claims Agent") in this Case in accordance with the

engagement agreement (the "Engagement Agreement") with Rust Omni. By reason of Rust

Omni's extensive experience in the industry, the Debtor believes that the retention of Rust Omni

is in the best interests of the Debtor and its estate and creditors.

58.     The Debtor has obtained and reviewed engagement proposals from at least

two (2) other court-approved claims and noticing agents to ensure selection through a

competitive process. Moreover, the Debtor submits, based on all engagement proposals obtained

and reviewed, that Rust Omni's rates are competitive and reasonable given Rust Omni's quality

of services and expertise.

59.     I anticipate that there will be in excess of 500 entities to be noticed. I believe that this retention is the most effective and efficient manner of noticing the creditors and parties in interest of the filing of the Case and other developments in the Case. Accordingly, I respectfully request that the Court authorize the Debtor to retain Rust Omni.

*[Remainder of Page Intentionally Left Blank]*

For all of the foregoing reasons, I respectfully request that the Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 9, 2015

Thomas A. Bologna